# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BRIAN SEAVITT, on behalf of himself and all other similarly-situated stockholders of N-ABLE, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2023-0326-JTL |
| N-ABLE, INC., | ) ) | |
| Defendant. | ) | |

## OPINION ADDRESSING THE VALIDITY OF PROVISIONS IN A STOCKHOLDERS AGREEMENT

Date Submitted: May 6, 2024
Date Decided: July 25, 2024

Thomas Curry, SAXENA WHITE, P.A., Wilmington, Delaware; David Wales, SAXENA WHITE, P.A., White Plains, New York; Adam Warden, SAXENA WHITE, P.A., Boca Raton, Florida; Julie Goldsmith Reiser, Richard A. Speirs, COHEN MILSTEIN SELLERS & TOLL PLLC, New York, New York; *Counsel for Plaintiff.*

Raymond J. DiCamillo, Matthew D. Perri, Nicole M. Henry, Kevin M. Kidwell, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Counsel for Defendant.*

**LASTER, V.C.**

This is another case in which investors took a company public and, in preparation for the IPO, caused the company to enter into a contract that granted the investors extensive governance rights. Under Section 141(a) of the Delaware General Corporation Law (the "DGCL"), "[t]he business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation."[1] Governance arrangements that do not appear in the charter and deprive boards of a significant portion of their authority contravene Section 141(a).

A stockholder plaintiff has challenged the validity of provisions in the governance agreement. The outcome largely parallels the results in the *Moelis* and *Wagner* decisions.[2] Many of the provisions are statutorily invalid.[3]

---

[1] 8 *Del. C.* § 141(a).

[2] *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 311 A.3d 809 (Del. Ch. 2024); *Wagner v. BRP Gp.*, --- A3d---, 2024 WL 2741191 (Del. Ch. May 28, 2024).

[3] Recently enacted legislation could change the outcome for a subset of the provisions. *See* 84 *Del. Laws* ch. 309 (2024) (the "Market Practice Amendments"). One aspect of that legislation adds a new Section 122(18) to the DGCL that authorizes governance agreements like the stockholders agreement in this case. The new statute provides that "[n]otwithstanding § 141(a)," a governance agreement can contain provisions that "(a) restrict or prohibit [the corporation] from taking actions specified in the contract, (b) require the approval or consent of one or more persons or bodies before the corporation may take actions specified in the contract (which persons or bodies may include the board of directors or one or more current or future directors, stockholders or beneficial owners of stock of the corporation), and (c) covenant that the corporation or one or more persons or bodies will take, or refrain from taking, actions specified in the contract (which persons or bodies may include the board of directors or one or more current or future directors, stockholders or beneficial owners of stock of the corporation). *Id.* (the "Governance Agreement Provision"). A provision in a governance agreement is not enforceable, however, "[t]o the extent such provision is contrary to the certificate of incorporation or would be contrary to the laws of this State … if included in the certificate of incorporation." *Id.* That legislation specifically provides,

But this case adds one twist. A handful of provisions in the certificate of incorporation states they are "subject to" the governance agreement. The company asserts that this laconic prepositional phrase incorporates the governance agreement into the charter by reference, thereby elevating the contract's commitments to the status of Section 141(a)-compliant, charter-based limitations.[4]

Surprisingly, no case has addressed whether a charter can incorporate a private contract by reference. The structure of the DGCL forecloses that path.

The charter is a corporation's foundational firm-specific document. Although general incorporation statutes have standardized the process for obtaining a charter and pushed the state's role into the background, the issuance of a charter and the concomitant creation of an artificial person remains an exercise of governmental power akin to the enactment of a statute. The General Assembly cannot incorporate private agreements into a statute. That goes for a charter as well.

The public nature of a charter also means it cannot incorporate a private agreement by reference. The DGCL requires companies to publicly file their charters with the Delaware Secretary of State. Any amendments must be filed too. That requirement ensures easy public access to the charter so that anyone can determine what the charter authorizes, prohibits, or limits. Permitting a charter to incorporate

---

however, that pending cases like this one must go forward under the pre-amendment regime. *Id.*

[4] Under the recently enacted Governance Agreement Provision, there is no need for an incorporation-by-reference workaround.

2

a private agreement by reference undermines the public nature of a charter, particularly for private companies.

The language of the DGCL also forecloses incorporation by reference. The DGCL addresses when a charter or instrument can reference outside sources. The DGCL specifically authorizes a charter to include provisions dependent on "facts ascertainable" outside of that document. The DGCL nowhere authorizes a charter to incorporate "agreements ascertainable" or "provisions ascertainable."

A charter is also unique in that the DGCL establishes a mandatory procedure for any amendments. Parties cannot simply amend the charter in any manner they wish, nor can they create bespoke amendment procedures, such as only requiring board approval. Allowing the incorporation by reference of a private agreement would undermine the certainty and stability of the charter. The parties to the governance agreement—typically the corporation and a favored stockholder—could amend their governance agreement without following the DGCL's requirements. By amending the governance agreement, they would amend the charter.

Permitting parties to amend the charter by amending a governance agreement would deprive non-party stockholders of their statutory right to vote. The DGCL's requirements for a charter amendment identify two steps that must be followed in precise order: first, the board must approve the amendment and recommend it to the stockholders; second, the stockholders must approve the amendment. If a charter incorporates a private agreement by reference, and if the parties to the private

3

agreement can amend it themselves, then the non-party stockholders have lost their right to vote.

Attempting to incorporate a contract into a charter introduces the DNA of a purely private agreement into a foundational and public document. Rather than man or bull, it spawns a corporate minotaur. The DGCL does not permit the creation of a corporate mutant. The company's attempt to side-step the limitations of Section 141(a) through incorporation by reference falls short.

## I. FACTUAL BACKGROUND

The parties filed cross-motions for summary judgment. The pertinent facts are undisputed.[5]

### A. The Spinoff

Before July 2021, N-able, Inc. (the "Company") existed as a wholly owned subsidiary of SolarWinds Corporation. Two private equity firms controlled SolarWinds: Silver Lake Group, LLC and Thoma Bravo, LLC (together, the "Lead Investors").

On July 19, 2021, SolarWinds spun off the Company. In the spinoff, each stockholder of SolarWinds received one share of Company common stock for every two shares of SolarWinds common stock.[6]

---

[5] Citations in the form "PX __" refer to exhibits that the plaintiff submitted with its opening brief or reply brief. Citations in the form "DX __" refer to exhibits that the Company submitted with its opening brief and reply brief. Citations in the form "Tr. __" are to the transcript of the oral argument. Dkt. 26.

[6] PX 4 at 52.

The spinoff marked the start of the Company's existence as a publicly traded corporation. Since the spinoff, its common stock has traded on the New York Stock Exchange under the ticker symbol "NABL."

The complaint does not allege how much stock the Lead Investors held after the spinoff. The complaint alleges that the Lead Investors currently own approximately 62%.

## B. The Stockholders Agreement

In anticipation of the spinoff, the Lead Investors restructured the Company's internal governance. As part of that effort, they amended and restated the Company's certificate of incorporation (the "Charter").[7] They also amended and restated the Company's bylaws (the "Bylaws").[8]

Pertinent to this dispute, the Lead Investors and the Company entered into a governance agreement, which they called the "Stockholders Agreement."[9] The Lead

---

[7] PX 3 (cited as "Charter").

[8] PX 6 (cited as "Bylaws").

[9] PX 1 (cited as "SA"). The Stockholders Agreement was amended as of December 13, 2021. PX 2 (the "Amendment" or "Amend."). This decision addresses the Stockholders Agreement as amended. Among other things, the Amendment removed the Thoma Bravo investors as parties to the Stockholders Agreement. Amend. § 5.

The parties to the Stockholders Agreement include the Company and various affiliates of the Lead Investors. One Silver Lake co-investor and over a score of Thoma Bravo co-investors signed the agreement. For purposes of this decision, the distinction between the Lead Investors and the affiliates and co-investors is immaterial, because the Lead Investors control their rights under the Stockholders Agreement.

5

Investors included significant governance rights in the Stockholders Agreement, rather than putting them in the Charter or Bylaws.

### 1. The Pre-Approval Requirements

In a section titled "Covenants," the Stockholders Agreement requires the prior approval of both Lead Investors before the Company or any of its subsidiaries can take a wide range of actions (the "Pre-Approval Requirements").

The pertinent language states:

5.4 Actions Requiring Approval of the Lead Investors. So long as the Lead Investors collectively continue to hold at least 30% of the aggregate number of then outstanding shares of Common Stock of the Company, the following actions by the Company or any of its Subsidiaries shall require the prior written consent of each Lead Investor that is then entitled to nominate at least two Directors to the Board:

5.4.1 Entering into or effecting a Change of Control.

5.4.2 Directly or indirectly, entering into or effecting any transaction or series of related transactions involving, or entering into any agreement providing for, (a) the purchase, lease, license, exchange or other acquisition by the Company or its Subsidiaries of any assets and/or equity securities for consideration having a fair market value (as reasonably determined by the Board) in excess of $150.0 million and/or (b) the sale, lease, license, exchange or other disposal by the Company or its Subsidiaries of any assets and/or equity securities having a fair market value or for consideration having a fair market value (in each case as reasonably determined by the Board) in excess of $300.0 million; in each case, other than transactions solely between or among the Company and one or more of its direct or indirect wholly-owned Subsidiaries. For the avoidance of doubt, if any Lead Investor (including any Silver Lake Director, in the case of Silver Lake, or Thoma Bravo Director, in the case of Thoma Bravo) recuses itself from a decision with

---

Six members of Company management signed the Stockholders Agreement. It is not clear whether the Lead Investors believe that the Stockholders Agreement binds the members of management in their capacities as directors and officers of the Company. The plaintiff has not raised this point, and this decision expresses no view on it.

respect to any such transaction, the consent of such Lead Investor shall not be required but the other Lead Investor will continue to have the consent right hereunder.

5.4.3 Directly or indirectly, entering into any joint venture or similar business alliance involving, or entering into any agreement providing for, the investment, contribution or disposition by the Company or its Subsidiaries of assets (including stock of Subsidiaries) having a fair market value (as reasonably determined by the Board) in excess of $150.0 million, other than transactions solely between or among the Company and one or more of its direct or indirect wholly-owned Subsidiaries.

5.4.4 Incurring (or extending, supplementing or otherwise modifying any of the material terms of) any indebtedness for borrowed money (including any refinancing of existing indebtedness), assuming, guaranteeing, endorsing or otherwise as an accommodation becoming responsible for the obligations of any other Person (other than the Company or any of its Subsidiaries), or entering into (or extending, supplementing or otherwise modifying any of the material terms of) any agreement under which the Company or any Subsidiary may incur indebtedness for borrowed money in the future, in each case in an aggregate principal amount in excess of $300.0 million in any transaction or series of related transactions and other than a drawdown of amounts committed (including under a revolving facility) under a debt agreement that previously received the prior written consent of the Lead Investors or that was entered into on or prior to the date hereof.

5.4.5 Initiating a voluntary liquidation, dissolution, receivership, bankruptcy or other insolvency proceeding involving the Company or any Subsidiary of the Company that is a "significant subsidiary" as defined in Rule 1-02 of Regulation S-X under the Exchange Act.

5.4.6 Terminating the employment of the Chief Executive Officer of the Company or hiring a new Chief Executive Officer of the Company.

5.4.7 Increasing or decreasing the size of the Board.[10]

---

[10] SA § 5.4 (emphasis removed). The Amendment altered the first sentence of Section 5.4. Amend. § 4. The decision quotes the provision as amended.

Viewed in their totality, the Pre-Approval Requirements require the Company's board of directors (the "Board") to obtain the prior written approval of both Lead Investor for a broad swathe of actions that otherwise would fall within the Board's plenary authority. In their specificity, the Pre-Approval Requirements go far beyond what a controlling stockholder could achieve by exercising its voting power at the stockholder level. The Pre-Approval Requirements enable the Lead Investors to enter the boardroom and take control of specific board-level decisions.

As demonstrated by the introductory clause, the Lead Investors can continue to exercise the Pre-Approval Requirements as long as they jointly hold at least 30% of the Company's common stock. The Stockholders Agreement thus gives the Lead Investors granular control rights that they can continue to exercise even as they sell of shares and their ownership declines.[11]

### 2. The Board Composition Covenants

In a section titled "Corporate Governance," the Stockholders Agreement provides the Lead Investors with the ability to determine the composition of the Board (the "Board Composition Covenants"). There are six provisions at issue: the Board Size Covenant, the Nomination Covenant, the Recommendation Covenant, the Efforts Covenant, the Vacancy Covenant, and the Nomination Veto.

---

[11] The Stockholders Agreement includes a provision titled "Post-Distribution Sell-Downs" that contemplates the Lead Investors selling down their positions. SA § 3.2.

### a. The Board Size Covenant

The Board Size Covenant requires that the Company maintain a Board of eight directors. Not only that, but the Stockholders Agreement mandates that the Board change its size if requested in writing by the Lead Directors or to the extent required by law. The operative language states:

> On and after the Effective Time, the Board shall consist of eight (8) Directors; provided, that the Board shall further increase
>
> (a) the number of Independent Directors to the extent necessary to comply with applicable law and the Stock Exchange rules, or as otherwise agreed by the Board, subject to the rights of the Lead Investors under Section 5.4.7,[12] or
>
> (b) the number of Directors as otherwise requested in writing by the Lead Investors.[13]

Because of the Board Size Covenant, the Board cannot increase or decrease the size of the Board as the directors see fit.

### b. The Nomination Covenant

The Nomination Covenant gives the Lead Investors the right to nominate individuals whom the Company must include in its proxy materials and on its proxy

---

[12] Recall that the Pre-Approval Requirement found in Section 5.4.7 requires the Lead Investors' prior written approval before "[i]ncreasing or decreasing the size of the Board." SA § 5.4.7. This requirement persists "[s]o long as the Lead Investors collectively continue to hold at least 30% of the aggregate number of then outstanding shares of Common Stock of the Company . . ." and the Lead Investors are "entitled to nominate at least two Directors to the Board." *Id.* § 5.4. The Lead Investors thus benefit from a negative covenant limiting the Board's size (i.e., no changes without the Lead Investors' consent), plus an affirmative covenant compelling the Board to act.

[13] *Id.* § 2.1.1 (formatting added).

card. The number of individuals whom the Lead Investors can nominate depends on their level of stock ownership.

Two sections of the Stockholders Agreement address the number of nominees that the Lead Investors can name.[14] One section addresses Silver Lake's nominees. The other addresses Thoma Bravo's nominees. Both provisions are identical. The Silver Lake provision is representative and states:

So long as the Aggregate Silver Lake Ownership continues to be

(i) at least 20% of the aggregate number of then outstanding shares of Common Stock of the Company, Silver Lake shall be entitled to nominate three Directors,

(ii) less than 20% but at least 10% of the aggregate number of then outstanding shares of Common Stock of the Company, Silver Lake shall be entitled to nominate two Directors and

(iii) less than 10% but at least 5% of the aggregate number of then outstanding shares of Common Stock of the Company, Silver Lake shall be entitled to nominate one Director.

. . . Notwithstanding the foregoing, Silver Lake shall be entitled to nominate three Directors only if the total number of Directors (inclusive of the number of Directors nominated by Silver Lake and Thoma Bravo) exceeds seven Directors.[15]

---

[14] *Id.* §§ 2.1.2(a) & (b). The Amendment modified these provisions. Amend. §§ 1 & 2. This decision addresses the amended versions. This decision does not express any view on Section 2.4 of the Stockholders Agreement, which purports to give the Lead Investor designees the power to call a special meeting of the Board. That is a provision that could readily appear in the Charter or Bylaws; it is dubious only because it appears in the Stockholders Agreement. The Governance Agreement Provision enacted as part of the Market Practice Amendments would affect the analysis in case filed after August 1, 2024.

[15] *Id.* § 2.1.2(a) (formatting added).

10

Because Thoma Bravo receives identical rights, the Lead Investors are guaranteed the ability to name six of eight directors for as long as they each hold at least 20% of the outstanding shares. If their ownership drops to as low as 10% each, the Lead Investors would still be guaranteed the ability to name four out of eight directors.

### c. The Recommendation Covenant And The Efforts Covenant

The Recommendation Covenant obligates the Board to recommend the Lead Investors' nominees for election as directors and forces the Company to include the Lead Investors' nominees on its slate. The Efforts Covenant obligates the Company to use reasonable best efforts to secure the election of the Lead Investors' nominees. The operative language states:

> The Company hereby agrees (i) to include the nominees of the Lead Investors nominated pursuant to this Section 2.1.2 as the nominees to the Board on each slate of nominees for election of the Board included in the Company's annual meeting proxy statement (or consent solicitation or similar document),
>
> (ii) to recommend the election of such nominees to the stockholders of the Company and
>
> (iii) without limiting the foregoing, to otherwise use its reasonable best efforts to cause such nominees to be elected to the Board, including providing at least as high a level of support for the election of such nominees as it provides to any other individual standing for election as a director.[16]

This provision obligates the Company to endorse the Lead Investors' nominees for election—which means as a practical matter the Board must endorse them for

---

[16] *Id.* § 2.1.2(c) (formatting added).

election—regardless of whether the Board actually supports them. The Company also must exert reasonable best efforts to ensure the successful election of the Lead Investors' nominees to the Board.

### d. The Vacancy Covenant

The Vacancy Covenant obligates the Board to fill any vacancy in a seat occupied by a Lead Investors' designee with another Lead Investors' designee. It states:

> If (i) a Director position is vacant (including due to a Lead Investor not nominating a Director) and a Lead Investor is entitled to fill that vacant position and (ii) such Lead Investor elects to nominate a Director to fill that position, the Board shall take all actions necessary to appoint such nominee to the Board as promptly as practicable.[17]

Without the Lead Investors' permission, the Board cannot fill a vacancy in a seat previously held by a Lead Investors' designee with anyone other than another Lead Investors' designee.

### e. The Nomination Veto

The Nomination Veto gives the Lead Investors the right to veto nominees for any seat on the Board. The language states:

> Any recommendation of the Nominating Committee shall require the approval of the Silver Lake Director (if any) serving on the Nominating Committee, for so long as the Aggregate Silver Lake Ownership continues to be at least 10% of the aggregate number of outstanding shares of Common Stock, and the Thoma Bravo Director (if any) serving on the Nominating Committee, for so long as the Aggregate Thoma

---

[17] *Id*. § 2.1.6(a).

Bravo Ownership continues to be at least 10% of the aggregate number of outstanding shares of Common Stock.[18]

The Nomination Veto ensures that the Lead Investors control whom the Nominating Committee recommends, as long as they each hold at least 10% of the common stock.

### 3. The Committee Composition Provisions

The Corporate Governance section of the Stockholders Agreement also contains the Committee Composition Provisions. They ensure that the Lead Investors have representation on Board committees. The pertinent language states:

(a) . . . Subject to Section 2.1.4(d),[19] for so long as the Company maintains the Audit Committee, it shall consist of at least one Silver Lake Director (but only if Silver Lake is then entitled to nominate at least one Silver Lake Director) and at least one Thoma Bravo Director (but only if Thoma Bravo is then entitled to nominate at least one Thoma Bravo Director).

(b) Subject to Section 2.1.4(d), for so long as the Company maintains the Compensation Committee and Nominating Committee, such committees shall each consist of at least one Silver Lake Director (but only if Silver Lake is then entitled to nominate at least one Silver Lake Director) and at least one Thoma Bravo Director (but only if Thoma Bravo is then entitled to nominate at least one Thoma Bravo Director).

(c) Subject to Section 2.1.4(d), any committee of the Board not specified in Section 2.1.4(a) or 2.1.4(b) shall consist of at least one Silver Lake

---

[18] *Id*. § 2.1.6(d). The Amendment modified this provision. Amend. § 3. This decision addresses the amended versions.

[19] Section 2.1.4(d) requires the Board "upon the recommendation of the Nominating Committee" to "modify the composition of any [] committee to the extent required to comply with [] applicable law or the Stock Exchange rules." SA § 2.1.4(d). This provision also allows the Board to fill a vacant director committee position if the Lead Investors are not entitled or decline to designate a director for the seat. But the Board does not have free rein even then, because the "vacant position shall be filled by the Board upon the recommendation of the Nominating Committee," and any recommendation from the Nominating Committee is subject to the Lead Investors' Nomination Veto.

Director (but only if Silver Lake is then entitled to nominate at least one Silver Lake Director) and at least one Thoma Bravo Director (but only if Thoma Bravo is then entitled to nominate at least one Thoma Bravo Director) and such additional members as may be determined by the Board;

provided, that a special committee may exclude Directors nominated by the Lead Investors if

(i) no such Director is eligible to serve on such special committee due to the rules and requirements of any national stock exchange on which the Company's stock is listed or

(ii) the primary purpose of such special committee is to review, assess and/or approve a transaction in which the applicable Lead Investor has a material direct or indirect interest and having such Lead Investor's Director appointed on such special committee would constitute a clear conflict of interest, in each case as determined by a majority of the Independent Directors in their reasonable good faith discretion.[20]

The Stockholders Agreement contemplates that the Lead Investors will maintain at least one Board seat each so long as they own at least 5% of the Company. As long as that is the case, the Committee Composition Provisions purport to give each of the Lead Investors a seat on every committee, subject to the two exceptions for special committees.

## C. The Removal Provision

As noted, the Lead Investors caused the Company to adopt the Charter in connection with the spinoff. The Charter provides for a classified board.[21] Under

---

[20] *Id.* § 2.1.4.

[21] Charter, art. VI, pt. C. Because the plaintiff has not challenged it, this decision does not address a provision in the Charter that purports to eliminate—*yes, literally eliminate*—an aspect of the fiduciary duties that SolarWinds, the Lead Investors, and their affiliates

14

Delaware law, unless the charter provides otherwise, directors on a classified board can be removed only for cause, and only by the affirmative vote of at least a majority of the voting power present and entitled to vote.[22]

The Removal Provision purports to modify both aspects of Section 141(k)(i). First, the Removal Provision authorizes removal without cause. Second, the Removal Provision authorizes the Lead Investors to remove a director without cause, even if the Lead Investors are not "holders of a majority of the shares then entitled to vote at an election of directors."[23] The operative language states:

> Subject to the rights of the holders of any series of Preferred Stock then outstanding or the rights granted pursuant to the Stockholders Agreement and notwithstanding any other provision of this Certificate, (i) prior to the first date on which the Investors and their Affiliates cease to beneficially own (directly or indirectly) in the aggregate at least 30% of the voting power of the then outstanding shares of capital stock of the Corporation then entitled to vote generally in the election of directors, directors may be removed with or without cause upon the affirmative vote of the Investors and their respective Affiliates which beneficially own shares of capital stock of the Corporation entitled to vote generally in the election of directors and (ii) on and after such date, directors may only be removed for cause (as defined below) and only upon the affirmative vote of stockholders representing at least sixty-six and two-thirds percent (66-2/3%) of the voting power of all of the then outstanding shares of the capital stock of the Corporation entitled to

---

otherwise would owe, including when serving as officers and directors of the Company. *See id.* art. IX, pt. B.

[22] 8 *Del. C.* § 141(k) ("Any director or the entire board of directors may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors, except as follows: (i) Unless the certificate of incorporation otherwise provides, in the case of a corporation whose board is classified as provided in subsection (d) of this section, stockholders may effect such removal only for cause . . . .").

[23] *Id.*

vote generally in the election of directors, voting together as a single class.[24]

Thus, so long as Lead Investors hold a combined total of at least 30% of the Company's outstanding shares, the Charter purports to give them the power to remove directors from a classified board without cause.

## D. This Litigation

The plaintiff owns shares of the Company's common stock. He purchased his shares in May 2022. He filed this action on March 16, 2023. He seeks a determination that the challenged provisions are invalid. After the Company answered the complaint, the parties filed cross-motions for summary judgment.

## II. LEGAL ANALYSIS

Under Court of Chancery Rule 56, summary judgment "shall be rendered forthwith" if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[25] The parties agree on the facts. They only disagree about issues of law.

The plaintiff has mounted a facial challenge to the Pre-Approval Requirements, the Board Composition Covenants, the Committee Composition Provisions, and the Removal Provision. The Delaware Supreme Court has stated that

---

[24] Charter, art. VI, pt. F.

[25] Ct. Ch. R. 56(c).

16

to succeed on a facial challenge, the plaintiff must show that that a challenged provisions cannot operate lawfully "*under any circumstances.*"[26]

## A.    The Section 141(a) Challenge To The Pre-Approval Requirements

The plaintiff contends that the Pre-Approval Requirements violate Section 141(a) of the DGCL. That section "declares that the business and affairs of every corporation organized under the General Corporation Law shall be managed by or under the direction of a board of directors, except as may otherwise be provided in the statute itself or in the certificate of incorporation."[27]

For 125 years, Section 141(a) has stood as the cornerstone of Delaware's board-centric model of corporate law. Delaware Supreme Court decisions regularly cite the foundational role of that section.[28]

---

[26] *Salzberg v. Sciabacucchi*, 227 A.3d 102, 113 (Del. 2020).

[27] David A. Drexler, Lewis S. Black, Jr. & A. Gilchrist Sparks, III, *Delaware Corporation Law & Practice* § 13.01[1] (2002 & Supp.) [hereinafter Drexler].

[28] *See, e.g.*, *Quickturn Design Sys., Inc. v. Shapiro (Quickturn II),* 721 A.2d 1281, 1291–92 (Del. 1998) ("One of the most basic tenets of Delaware corporate law is that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation. Section 141(a) . . . confers upon any newly elected board of directors *full* power to manage and direct the business and affairs of a Delaware corporation." (emphasis in original) (citation omitted)); *Paramount Commc'ns Inc. v. QVC Network Inc.,* 637 A.2d 34, 41–42 (Del. 1994) ("The General Corporation Law of the State of Delaware . . . and the decisions of this Court have repeatedly recognized the fundamental principle that the management of the business and affairs of a Delaware corporation is entrusted to its directors, who are the duly elected and authorized representatives of the stockholders."); *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 179 (Del. 1986) ("The ultimate responsibility for managing the business and affairs of a corporation falls on its board of directors." (citing Section 141(a))); *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 953 (Del. 1985) ("The board has a large reservoir of authority upon which to draw. Its duties and responsibilities proceed from the inherent powers conferred by 8 *Del. C.* § 141(a)."); *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984) ("The bedrock of the General Corporation Law

17

An extensive body of Delaware precedent analyzes Section 141(a) claims.[29] This court recently examined those precedents and concluded that the overwhelming weight of authority recognizes the viability of a Section 141(a) challenge to a nominally third-party agreement that nevertheless addresses the corporation's internal affairs.[30] As a leading Delaware treatise notes, "[a]n agreement among less than all stockholders cannot substantially divest directors of their responsibility to manage the business and affairs of the corporation."[31]

At the same time, a corporation obviously can and must enter into third-party contracts in order to conduct business. Delaware decisions have regularly

---

of the State of Delaware is the rule that the business and affairs of a corporation are managed by and under the direction of its board." (citing Section 141(a)) (subsequent history omitted)).

Going forward, the Governance Agreement Provision moves Delaware's historically board-centric regime towards the fully contractarian end of the spectrum. That amendment states that notwithstanding Section 141(a), a governance agreement can contain (i) restrictions on corporate action, (ii) requirements that persons or bodies (including one or more current or future directors, stockholders, or beneficial owners of stock) give their approval or consent before the corporation can take action, and (iii) covenants requiring that the corporation or one or more persons or bodies (including the board or one or more current or future directors, stockholders or beneficial owners) take action. The Governance Agreement Provision contains an exception providing that a provision in a governance agreement remains unenforceable if it is contrary to the certificate of incorporation or would be contrary to Delaware law if included in the certificate of incorporation. An exception to the exception permits a governance agreement to contain provisions contrary to Section 115 of the DGCL, which states that "no provision of the certificate of incorporation or the bylaws may prohibit bringing such claims in the courts of this State." 8 *Del. C.* § 115.

[29] *See Moelis*, 311 A.3d at 831–55 (collecting authorities).

[30] *Id*. at 859–61.

[31] Drexler, *supra*, § 13.01[1][a], at 13-3.

18

acknowledged that banal reality.[32] For example, in *Grimes II*, the Delaware Supreme

Court observed that

> [a] board which has decided to manufacture bricks has less freedom to
> decide to make bottles. In a world of scarcity, a decision to do one thing
> will commit a board to a certain course of action and make it costly and
> difficult (indeed, sometimes impossible) to change course and do
> another. This is an inevitable fact of life and is not an abdication of
> directorial duty.[33]

That is plainly true. But it does not mean that contracts never violate Section 141(a).

What the law therefore requires is a means of distinguishing between internal

governance agreements, where Section 141(a) applies, and external commercial

agreements, where it does not. In *Moelis*, the court discerned just such a threshold

inquiry: "Although none of the cases say so expressly, they show that a court applying

Section 141(a) must first determine whether the challenged provision constitutes part

of the corporation's internal governance arrangement. If not, then the inquiry ends.

---

[32] *See, e.g.*, *Grimes v. Donald (Grimes II)*, 673 A.2d 1207, 1214 (Del. 1996)
("[B]usiness decisions are not an abdication of directorial duty merely because they
limit a board's freedom of future action."); *In re infoUSA, Inc. S'holders Litig.*, 953
A.2d 963, 999 (Del. Ch. 2007) ("Every contract approved by a board of directors, after
all, limits the discretion of the board in future transactions, but a board is empowered
to make agreements with other actors in commerce, including its own shareholders.")*;
Sample v. Morgan*, 914 A.2d 647, 671–72 (Del. Ch. 2007) ("Boards of directors
necessarily limit their future range of action all the time. For example, a core function
of boards is to 'manage' the business and affairs of the corporation. One aspect of
management involves procuring the factors of production the company needs to do its
business. If a board enters into a five-year exclusive agreement to purchase energy,
that necessarily limits its freedom to manage its procurement of energy. But that
does not mean that the board has 'abdicated' its authority to manage, it means that
the board has exercised its authority." (footnotes omitted)).

[33] *Grimes II*, 673 A.2d at 1214–15.

If so, then Section 141(a) applies."[34] Under this test, Section 141(a) only applies to arrangements that are intended to alter the statutorily-mandated allocation of authority between a board and the stockholders. The arc of Section 141(a) jurisprudence reveals that our courts have regularly drawn that distinction and tested nominally third-party agreements for compliance with the statute.[35]

If Section 141(a) applies, then the court looks to the test that Chancellor Seitz created in his seminal decision in *Abercrombie v. Davies*.[36] The Delaware Supreme Court has endorsed and adopted that test on no fewer than five occasions.[37] Under

---

[34] *Moelis*, 311 A.3d at 828.

[35] *See Grimes II*, 673 A.2d at 1214–15 (employment agreements with CEO); *Politan Cap. Mgmt. LP v. Masimo Corp.*, C.A. No. 2022-0948-NAC, at 173–91 (Del. Ch. Feb. 3, 2023) (TRANSCRIPT) (employment agreement with CEO); *Schroeder v. Buhannic*, 2018 WL 11264517, at *2, *4 (Del. Ch. Jan. 10, 2018) (ORDER) (stockholder agreement); *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at *4 (Del. Ch. Apr. 28, 2004) (stockholder agreement); *Nagy v. Bistricer*, 770 A.2d 43, 60–62 (Del. Ch. 2000) (merger agreement); *ACE Ltd. v. Cap. Re Corp.*, 747 A.2d 95, 106 (Del. Ch. 1999) (merger agreement); *In re Bally's Grand Deriv. Litig.*, 1997 WL 305803, at *5–6 (Del. Ch. June 4, 1997) (management agreement); *Jackson v. Turnbull*, 1994 WL 174668 (Del. Ch. Feb. 8, 1994), *aff'd*, 653 A.2d 306 (Del. 1994) (merger agreement).

[36] *Abercrombie v. Davies*, 123 A.2d 893 (Del. Ch. 1956), *rev'd on other grounds,* 130 A.2d 338 (Del. 1957). The *Abercrombie* decision invalidated two parts of a stockholders agreement. In one section, a stockholder who was also a director bound himself as a director to vote as agreed, and Chancellor Seitz held that such an agreement is void. *Id.* at 894–95 & n.1. The *Abercrombie* decision also addressed a part of the agreement in which other stockholder signatories bound themselves as stockholders to remove any director who failed to vote in line with the agreement. Chancellor Seitz held that those provisions also were invalid under Section 141(a). *Id.* at 899.

[37] *Grimes II*, 673 A.2d at 1214 (quoting *Abercrombie*, 123 A.2d at 899); *accord Quickturn II*, 721 A.2d at 1292; *Mayer v. Adams*, 141 A.2d 458, 461 (Del. 1958) (citing *Abercrombie* with approval); *Adams v. Clearance Corp.*, 121 A.2d 302, 305 (Del. 1956) (endorsing *Abercrombie*'s analysis). Two more recent Delaware Supreme Court opinions cite

the *Abercrombie* test, governance restrictions violate Section 141(a) when they "have the effect of removing from directors in a very substantial way their duty to use their own best judgment on management matters" or "tend[] to limit in a substantial way the freedom of director decisions on matters of management policy . . . ."[38]

### 1.    The Governance Arrangement Inquiry

The first step in analyzing a Section 141(a) claim is to determine whether the challenged provisions appear in an arrangement that governs the company's internal affairs. In this case, the challenged provisions meet that test.

One factor to consider is whether the agreement finds statutory purchase in the DGCL.[39] The DGCL governs a corporation's internal affairs, so if the DGCL contemplates a particular type of agreement, then it becomes more likely that some or all of that agreement addresses internal affairs. Stockholders agreements are grounded in Sections 218(c) and (d) of the DGCL.[40] Here, the challenged provisions appear in the Stockholders Agreement.

---

decisions that relied on *Abercrombie*, such as *Quickturn II* and *Grimes II*. *See CA, Inc. v. AFSCME Empls. Pension Plan (AFSCME)*, 953 A.2d 227, 238–39 (Del. 2008) (relying on *Quickturn II*; concluding that bylaw violated Section 141(a)); *McMullin v. Beran*, 765 A.2d 910, 924–25 & n.66 (Del. 2000) (relying on *Grimes II*; holding that complaint stated a claim that corporation improperly delegated to its controlling stockholder the task of initiating, negotiating, and approving a sale of the company to a third party).

[38] *Abercrombie*, 123 A.2d at 899.

[39] *Moelis*, 311 A.3d at 859.

[40] *Id.*

A second consideration is whether the corporation's counterparties hold roles as intra-corporate actors, such as officers, directors, stockholders, or their affiliates.[41] Intra-corporate actors operate within the corporation to cause the firm to exercise its powers. A contract that involves intra-corporate actors is therefore more likely to involve internal affairs. The Lead Investors are major stockholders, and the Stockholders Agreement is essentially a bilateral agreement between the Lead Investors and the Company.

A third consideration is whether the challenged provisions seek to direct how intra-corporate actors exercise corporate power. [42] The Pre-Approval Requirements constrain actions that only the Board can take. The Board Composition Covenants and the Committee Composition Provisions mandate action that only the Board can take. Except for the Nomination Covenant and the Efforts Covenant, all of the other covenants reference the Board expressly.

A fourth consideration is whether the arrangement readily reveals an underlying commercial exchange.[43] In a commercial agreement, the bargain is the point, and the parties might include the governance rights to protect the bargain.[44] In a governance arrangement, governance is the point, and the agreement exists to

---

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.*

22

allocate control rights.[45] Here, there was no underlying bargain that led the Company to grant the Lead Investors the extensive rights they received. The most that could be said is that when considering what rights they wanted if the Company went public, the Lead Investors decided they wanted the governance rights that appear in the Stockholders Agreement.

A fifth consideration is the duration of the contract and whether the corporation can freely terminate it. Governance arrangements are more likely to be enduring, even indefinite.[46] In this case the Board cannot unilaterally terminate the Stockholders Agreement. The Pre-Approval Requirements will exist so long as the Lead Investors continue to own, in the aggregate, 30% of the Company's total outstanding shares.[47] The Board Composition and Committee Composition Provisions will persist to various degrees until the Lead Investors own less than 5% of the Company.[48] Those features indicate that the purpose of the arrangement is to ensure that the Lead Investors enjoy granular control rights over the Company's internal affairs and can continue to exercise those rights as their ownership percentage falls.

---

[45] *Id.*

[46] *Id.* at 860.

[47] SA § 5.4.

[48] *See id*. §§ 2.1.2(a)–(b), 2.1.4(a)–(c).

23

A sixth consideration is the likely remedy for breach. In a commercial agreement, the presumptive remedy will be damages tied to the commercial bargain. With a governance arrangement, the presumptive remedy is likely to be equitable relief enforcing the control right.[49] The Stockholders Agreement provisions are designed to compel or prevent action, through specific performance if necessary.

A final consideration is the nature of the provisions at issue. The Stockholders Agreement contains a list of prototypical governance provisions that ordinarily would need to appear in the Charter or Bylaws. The Lead Investors simply chose to put the provisions in a contract. The resulting provisions give the Lead Investors more specific authority than any controlling stockholder could achieve solely by exercising stockholder-level voting power. As Chief Justice Strine observed while serving on this court,

> The reality is that controlling stockholders have no inalienable right to usurp the authority of boards of directors that they elect. That the majority of a company's voting power is concentrated in one stockholder does not mean that that stockholder must be given a veto over board decisions when such a veto would not also be afforded to dispersed stockholders who collectively own a majority of the votes. Like other stockholders, a controlling stockholder must live with the informed (i.e., sufficiently careful) and good faith (i.e., loyal) business decisions of the directors unless the DGCL requires a vote. That is a central premise of our law, which vests most managerial power over the corporation in the board, and not in the stockholders.[50]

---

[49] *Moelis*, 311 A.3d at 859–60.

[50] *Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 387 (Del. Ch. 2004), *appeal refused*, 871 A.2d 1128, 2004 WL 1732185 (Del. 2004) (TABLE).

The Pre-Approval Rights and Board Composition Covenants enable the Lead Investors to exercise issue-by-issue control over the Board, and the Stockholders Agreement enables the Lead Investors to continue to exercise those rights as they sell down.

The Stockholders Agreement is therefore part of the Company's entity-specific governance arrangement. Indeed, the Stockholders Agreement is another prototypical governance agreement that has all of the hallmarks of an effort to regulate the internal affairs of the Company. The Board Composition Covenants and the Committee Composition Provisions even appear in a section titled "CORPORATE GOVERNANCE." Even though the Stockholders Agreement is a separate contract, its provisions are subject to Section 141(a).

## 2. The Improper Restriction Inquiry

If a contract qualifies as part of an entity-specific governance arrangement, then Section 141(a) comes into play. At that point, the court must assess whether the arrangement has "the effect of removing from [the] directors in a very substantial way their duty to use their own best judgment on management matters" or "tends to limit in a substantial way the freedom of director[s'] decisions on matters of

management policy.”[51] An agreement can have that effect through direct or indirect board-level constraints, or through direct or indirect company-level constraints.[52]

The Company's governance structure reinforces the principle of board centrism embodied in Section 141(a). Echoing the statutory language, the Charter states: "The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors."[53] The Bylaws reiterate this point, stating: "The business and affairs of the Corporation shall be managed by or under the direction of a Board, who may exercise all of the powers of the Corporation except as otherwise provided by law or the Certificate of Incorporation."[54] Neither provision references the Stockholders Agreement.[55]

---

[51] *Abercrombie*, 123 A.2d at 899; *accord Quickturn II*, 721 A.2d at 1292; *Grimes II*, 673 A.2d at 1214; *see Mayer*, 141 A.2d at 461 (citing *Abercrombie* with approval); *Clearance Corp.*, 121 A.2d at 305 (same).

[52] *Moelis*, 311 A.3d at 830–31.

[53] Charter, art. VI, pt. A.

[54] Bylaws § 3.1.

[55] Under the Governance Agreement Provision, language tracking Section 141(a) has no meaningful effect. By stating that provisions in a governance agreement are unenforceable if they conflict with the certificate of incorporation, the Governance Agreement Provision authorizes corporations to opt out of its contract-centric regime, either for specific issues or generally. But the Governance Agreement Provision qualifies that limitation by stating that "a restriction, prohibition or covenant in any such contract that relates to any specified action shall not be deemed contrary to the laws of this State or the certificate of incorporation by reason of a provision of this title or the certificate of incorporation that authorizes or empowers the board of directors (or any one or more directors) to take such action." Because of that language, general recitals about board authority, like those in the Charter, are not sufficient after August 1, 2024, to maintain a board-centric regime. In the words of the synopsis, such a provision "merely authorizes the board of directors to manage, or direct the management of, the business and affairs of the corporation." Instead, "to render inoperable

26

### a. The Individual Pre-Approval Requirements

The Stockholders Agreement requires that the Company obtain prior written approval from both Lead Investors before taking action falling into seven categories. Each category encompasses decisions that the Board otherwise would make and where the Board would act as gatekeeper. Nominally, the Pre-Approval Requirements bind the Company. In practice, they operate as direct, board-level restrictions on the directors' ability to exercise their authority.

### i. Approving A Change Of Control

Pre-Approval Requirement 5.4.1 requires the Lead Investors' prior written approval before "[e]ntering into or effecting a Change of Control."[56] The Stockholders Agreement defines Change of Control as:

> any transaction or series of related transactions (whether by merger, consolidation, recapitalization, liquidation or sale or transfer of Common Stock or assets (including equity securities of Subsidiaries) or otherwise) as a result of which any Person or group, within the meaning of Section 13(d)(3) of the Exchange Act (other than Equity Investors and their respective Affiliates, any group of which the foregoing are members and any other members of such a group), obtains ownership, directly or indirectly, of (i) Shares that represent more than 50% of the total voting power of the outstanding capital stock of the Company or

---

the provisions of § 122(18), a certificate of incorporation could state the corporation lacks the power and authority to enter into the contracts authorized by § 122(18), or could state that the corporation lacks the power and authority to authorize specific contracts, or types of contracts, that would otherwise be authorized by § 122(18)." No charter currently contains such a provision, because Section 122(18) did not previously exist.

[56] SA § 5.4.1.

any applicable successor entity or (ii) all or substantially all of the assets of the Company and its Subsidiaries on a consolidated basis.[57]

Through this provision, the Lead Investors usurp the Board's ability to determine whether the corporation will engage in a "merger, consolidation, recapitalization, liquidation or sale or transfer of Common Stock or assets."[58]

Approving a merger or consolidation[59] or a sale of all or substantially all assets[60] requires a two-step process. First, the board of directors must initiate the process and recommend the transaction to stockholders.[61] Only then can the stockholders vote to approve the transaction.[62] A board cannot abdicate its statutory duties in a merger or consolidation,[63] and the same is logically true in a sale of all or substantially all assets.

---

[57] *Id.* § 7.2.

[58] *Id.*

[59] 8 *Del. C.* § 251.

[60] *Id.* § 271.

[61] *Id.* §§ 251(b), 271(a).

[62] *Id.* §§ 251(c), 271(b).

[63] *See ACE,* 747 A.2d at 97, 106 (holding that a no-talk provision within a merger agreement was "likely invalid" because the provision "involves an abdication by the board of its duty to determine what its own fiduciary obligations require at precisely that time in the life of the company when the board's own judgment is most important."); *Turnbull,* 1994 WL 174668, at *5 ("The [company] directors set a floor merger price, but left the final decision as to any higher price to a third party. . . . This delegation of the directors' statutory responsibility is impermissible."). The General Assembly responded to *Jackson* by amending Section 251. The statute now provides that a board can establish the amount of merger consideration by referring to "facts ascertainable" outside the merger agreement, including a person's determination. 8 *Del. C.* § 251(b).).

The Stockholders Agreement purports to displace the Board by giving the Lead Investors the right to decide up front whether the corporation will enter into a merger, consolidate, or sell all or substantially all of its assets. Without the Lead Investors' prior written approval, the Board cannot proceed. This is true regardless of the fact that the Company is the jural person nominally bound by the Stockholders Agreement.[64] That limitation does not appear in the Charter, and it therefore violates Section 141(a). It likewise violates the sections of the DGCL that specifically govern those forms of transactions and require that the Board take the lead and act as gatekeeper.

### ii. Terminating The Company's Existence

Pre-Approval Requirement 5.4.5 requires the Lead Investors' prior written approval in order to voluntarily terminate the Company's existence. That includes "[i]nitiating a voluntary liquidation, dissolution, receivership, bankruptcy or other insolvency proceeding involving the Company or any Subsidiary . . . ."[65]

Liquidation and dissolution are related terms. The act of dissolution begins the process of liquidation which ends with the cessation of a corporation's existence. Under the DGCL, the sequence for approving a dissolution has the same structure as a merger, consolidation, or sale of all or substantially all assets: first board approval,

---

[64] *See Schroeder*, 2018 WL 11264517, at *4 (holding that a stockholder agreement, nominally binding the company, would be invalid under Section 141(a) if it required the common stockholders, rather than the board, to select the CEO).

[65] SA § 5.4.5.

then majority stockholder approval.[66] But there is one exception: Dissolution can be achieved unilaterally, without board involvement, by a unanimous stockholder vote.[67]

In light of this statutory structure, all of a corporation's stockholders could agree in a stockholder agreement to unanimously vote in favor of dissolution, but the existence of that path is irrelevant to the ability of a governance arrangement to limit the board's authority to initiate a dissolution. Just as with a merger, consolidation, or sale of all or substantially all of the corporation's assets, the statutory order of operations is fixed. The board must go first and fulfill its role as gatekeeper. The Stockholders Agreement violates Section 141(a) and the specific statutes governing those transactions by putting the Lead Investors at the head of the line and empowering them to usurp the Board's role as gatekeeper.

The other transactions in this provision—such as "receivership, bankruptcy or other insolvency proceeding[s]" —involve either terminating the Company's existence or fundamentally altering it.[68] Those issues fall within of the Board's authority to manage the business and affairs of the Company.[69] Those transactions require a meaningful level of board involvement.

---

[66] 8 *Del. C.* § 275(a) & (b).

[67] *Id.* § 275(c).

[68] SA § 5.4.5.

[69] *E.g.*, *Unocal*, 493 A.2d at 953–54 (holding that Section 141(a) gave the board of directors the power and responsibility to intervene in response to a tender offer that posed a threat to corporate policy and effectiveness).

30

These are areas where the Board is supreme. Without an express limitation in the Charter, the Stockholders Agreement cannot elevate the Lead Investors over the Board as to these matters.

### iii.    Approving Transactions Over $150 Million

Pre-Approval Requirements 5.4.2 and 5.4.3 require the Lead Investors' prior written approval before the Company can take three actions. First, the provisions require Lead Investor pre-approval before the Company can acquire assets or equity securities through purchase, lease, license, exchange, or other means, where the consideration exceeds $150 million. Second, the provisions require Lead Investor pre-approval before disposing of assets or equity securities through sale, lease, license, exchange, or other means, where the fair market value exceeds $300 million. And third, the provisions require Lead Investor pre-approval before the Company can engage, directly or indirectly, in joint ventures or similar business alliances, and before the Company can enter into agreements involving the investment, contribution, or disposition of assets (including subsidiary stock), each with a fair market value exceeding $150 million.

If the restriction appeared in a commercial contract, then the analysis could be different. In *Sample*, for example, this court considered the validity of a provision in a transaction agreement that governed a new investor's purchase of a block of stock from the corporation's largest stockholder. As a condition to entering into that transaction, the buyer received a commitment from the corporation not to issue any shares of capital stock for five years (subject to exceptions not relevant here) (the

"Equity Capital Restriction").[70] In rejecting a Section 141(a) challenge to that provision, the *Sample* decision sought to do away entirely with Section 141(a) challenges to contracts, leaving only fiduciary review.[71] As the *Moelis* decision explained, that dramatic outcome conflicted with extensive Delaware precedent.[72] But even under the approach taken in *Moelis*, the provision could have survived a Section 141(a) challenge.

Under the analysis in *Moelis*, the validity of the Equity Capital Restriction would rise or fall based on the first step—whether it appeared in a governance agreement. For purposes of that analysis, the buyer's investment and the related Equity Capital Restriction could be viewed as part of a capital-raising transaction. On the facts of the case, the buyer purchased shares directly from the seller, but the

---

[70] *Sample v. Morgan*, 914 A.2d 657, 656 (Del. Ch. 2007).

[71] *Id.* at 672–73 ("Corporate acts thus must be 'twice-tested'—once by the law and again by equity. If a contract with a third-party is premised upon a breach of fiduciary duty, the contract may be unenforceable on equitable grounds and the third-party can find itself lacking the rights it thought it had secured. But the basis for that determination is the fact-intensive one demanded by equity, not a bright-line ruling that the contract is invalid simply because it delimited the range of discretion the directors otherwise had under the law to act.").

[72] *See Moelis*, 311 A.3d at 855 ("The *Sample* decision thus stands alone and on dubious ground in arguing for eliminating Section 141(a) challenges to corporate contracts. The weight of the Section 141(a) precedents, including the Delaware Supreme Court's decisions in *AFSCME*, *Quickturn II*, and *Grimes II*, supports the viability of those challenges. If read as Section 141(a) cases, the Delaware Supreme Court's decisions in *QVC* and *Omnicare* support those challenges as well. The Delaware Supreme Court's decisions are controlling."); *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co. (Moelis Preliminary Defenses),* 310 A.3d 985, 1005–08 (Del. Ch. 2024) (explaining why *Sample* "did not eliminate the ability to bring Section 141(a) challenges"). The Governance Agreement Provision seeks to achieve the same goal, albeit by statute rather than case law.

economic substance was akin to the buyer investing the purchase price in the corporation and receiving shares in return, then the corporation using the capital to repurchase the seller's shares.

Particularly if viewed as governing a capital-raising transaction, the contract containing the Equity Capital Restriction could be viewed as a commercial agreement, rather than a governance agreement. The buyer was not an insider at the time of contracting; there was evident consideration in the form of new money; the only protective provision related directly to the economic purpose of the transaction; and the arrangement was time-limited. Admittedly, there are factors pointing the other way: the DGCL addresses both stock issuances and redemptions[73]; the agreement limited the board's ability to exercise authority delegated exclusively to the board under Sections 161[74]; and the likely remedy for breach of the Equity Capital Restriction would have been injunctive relief. To the extent a court held that the Equity Capital Restriction appeared in a commercial agreement rather than a governance arrangement, the analysis would have ended and the Equity Capital Restriction would have survived.[75]

---

[73] *See* 8 *Del. C.* §§ 151–153, 160–61.

[74] 8 *Del. C.* § 161 ("The directors may, at any time and from time to time, if all of the shares of capital stock which the corporation is authorized by its certificate of incorporation to issue have not been issued, subscribed for, or otherwise committed to be issued, issue or take subscriptions for additional shares of its capital stock up to the amount authorized in its certificate of incorporation.").

[75] Quite striking differences exist between the lone Equity Capital Restriction in *Sample* and the extensive pre-approval requirements and affirmative covenants found in the

As drafted, this broad Pre-Approval Requirement appears in a governance agreement, and it only applies to material transactions that fall within the Board's authority. For those transactions, the Pre-Approval Requirement purports to replace the Board with the Lead Investors by making them the gatekeeper for these transactions. Absent a limitation in the Charter, those limitations are facially invalid under Section 141(a).

### iv. Hiring And Firing The CEO

Pre-Approval Requirement 5.4.6 requires the Lead Investors' prior written approval before "[t]erminating the employment of the Chief Executive Officer of the Company or hiring a new Chief Executive Officer of the Company."[76] That provision is facially invalid for the reasons discussed in the recent *Wagner* case.[77]

### v. Incurring Debt

Pre-Approval Requirement 5.4.4 requires the Lead Investors' prior written approval before the Company can incur debt above a certain level. The pertinent language requires the Lead Investors' pre-approval before

---

governance agreements at issue in *Moelis*, *Wagner*, and this case. It seems understandable why practitioners would have read *Sample* as indicating that some types of governance restrictions could be implemented by contract. It is hard (at least for me) to see how *Sample* and the balance of the Section 141(a) canon could be read to authorize something on the order of the eighteen pre-approval requirements and six affirmative covenants in *Moelis*, or the similar suites of provisions in *Wagner* and this case. It is therefore surprising (again for me at least) to learn that practitioners concluded that a *Moelis*-style governance agreement would work and began implementing them widely. Regardless, going forward, the Governance Agreement Provision enacts a new regime that will require a different analysis.

[76] SA § 5.4.6.

[77] *Wagner*, 2024 WL 2741191, at *16–17.

[i]ncurring (or extending, supplementing or otherwise modifying any of the material terms of) any indebtedness for borrowed money (including any refinancing of existing indebtedness), assuming, guaranteeing, endorsing or otherwise as an accommodation becoming responsible for the obligations of any other Person (other than the Company or any of its Subsidiaries), or entering into (or extending, supplementing or otherwise modifying any of the material terms of) any agreement under which the Company or any Subsidiary may incur indebtedness for borrowed money in the future, in each case in an aggregate principal amount in excess of $300.0 million in any transaction or series of related transactions . . .[78]

The provision is thus limited to transactions involving material amounts.

A corporation has the power to "incur liabilities, borrow money at such rates of interest as the corporation may determine, issue its notes, bonds and other obligations, and secure any of its obligations[.]"[79] Yet the Pre-Approval Requirement in Section 5.4.4 says that the Company cannot approve borrowings in excess of $300 million unless the Lead Investors first approve it in their capacities as stockholders. A provision that restricts a board from exercising its authority over material transactions violates Section 141(a).

This is another issue where the analysis would be different if the restriction appeared in a commercial contract. Consider a situation where a company borrows from a lender and agrees that without the lender's prior approval, the company will not borrow any additional amounts. In that setting, the commercial contract governs the extension of credit, and the lender consent right protects the lender's right to

---

[78] SA § 5.4.4.

[79] 8 *Del. C.* § 122(13).

repayment. That would not be a governance agreement, so Section 141(a) would not apply.

The Stockholders Agreement is not a commercial contract. It is a governance arrangement designed to give the Lead Investors granular control over the Company's internal affairs. The Board's authority to incur indebtedness above the threshold amount is constrained by the requirement that the Lead Investors give their prior written approval. This requirement is not in the Charter. Thus, the Pre-Approval Requirement in Section 5.4.4 is facially invalid.

### vi.     Changing The Size Of The Board

Pre-Approval Requirement 5.4.7 requires the Lead Investors' prior written approval before "[i]ncreasing or decreasing the size of the Board" (the "Size Requirement").[80] The Size Requirement is invalid because it conflicts with Sections 141(a) and (b) and the Charter.[81]

As a threshold manner, reviewing the Charter, Bylaws, and Stockholders Agreement demonstrates the confusion that can result from attempting to address the same matters through multiple governance documents, rather than putting provisions in the governance documents where they belong. Here, the Company's

---

[80] SA § 5.4.7.

[81] *Chapin v. Benwood Found., Inc.*, 402 A.2d 1205 (Del. Ch. 1979) (holding that directors of a non-stock corporation (who were called trustees) could not bind themselves by agreement to maintain a board size of four members when the governing documents permitted a range of three to five), *aff'd sub nom. Harrison v. Chapin*, 415 A.2d 1068 (Del. 1980)).

Charter does not fix the number of directors. Instead, it empowers the Lead Investors to determine the size of the Board. It states:

> Subject to any rights of the holders of any series of Preferred Stock then outstanding or the rights granted pursuant to the Stockholders Agreement to elect additional directors under specified circumstances, the number of directors which shall constitute the Board of Directors shall be fixed exclusively from time to time by,
>
> (i) for so long as the Silver Lake Investors and Thoma Bravo Investors (collectively, the "Investors") collectively beneficially own (directly or indirectly), in the aggregate, at least 40% of the outstanding Common Stock of the Corporation, the Investors, or
>
> (ii) thereafter, resolution adopted by the affirmative vote of a majority of the directors then in office.[82]

As discussed below, the language "[s]ubject to the rights granted pursuant to the Stockholders Agreement to elect additional directors under specified circumstances" cannot incorporate provisions of the Stockholders Agreement by reference and is a nullity.[83] But the language giving the Lead Investors the exclusive right to set the number of directors as long as their aggregate ownership exceeds 40% is valid because it appears in the Charter.

The Bylaws establish yet another mechanism for determining board size, but it conflicts with the Charter and is invalid.[84] It states "the number of directors shall

---

[82] Charter, art. VI, pt. B (cleaned up).

[83] *See* Part II.B.1, *infra*.

[84] *Airgas, Inc. v. Air Prods. & Chems., Inc.*, 8 A.3d 1182, 1189 (Del. 2010) ("It is settled Delaware law that a bylaw that is inconsistent with the corporation's charter is invalid."); *Sinchareonkul v. Fahnemann*, 2015 WL 292314, at *6 (Del. Ch. Jan. 22, 2015) ("A bylaw that conflicts with the charter is void . . . .").

initially be seven (7) and, thereafter, shall be fixed from time to time exclusively by the Board[.]"[85] During the period when the Lead Investors have the Charter-based right to determine the size of the Board, that Bylaw conflicts with the Charter and is invalid. Once the Lead Investors' ownership stake falls below 40%, the Bylaw conflicts with the Charter because the Bylaw contemplates a decision by a majority of the directors present at a meeting where a quorum exists, while the Charter requires "the affirmative vote of a majority of the directors then in office."[86] There are no circumstances when the Bylaw can operate validly.

The Size Requirement in the Stockholders Agreement contemplates a completely different mechanism. It states:

> [T]he Board shall consist of eight (8) Directors; provided, that the Board shall further increase (a) the number of Independent Directors to the extent necessary to comply with applicable law and the Stock Exchange rules, or as otherwise agreed by the Board, subject to the rights of the Lead Investors under Section 5.4.7,[87] or (b) the number of Directors as otherwise requested in writing by the Lead Investors.[88]

Under this provision, the Board is always required to set the number of directors at the number requested by the Lead Investors, regardless of their holdings.

---

[85] Bylaws § 3.3.

[86] Charter, art. VI, pt. B.

[87] SA § 5.4.7 contains the Pre-Approval Requirement where the Lead Investors must give their prior written approval before the Board's size may be increased or decreased.

[88] *Id.* § 2.1.1.

At present, the Size Requirement is doing nothing because the Charter gives the Lead Investors the exclusive right to set the number of directors as long as their aggregate ownership exceeds 40%, and the Lead Investors current ownership exceeds 60%.[89] Because the Charter already contains a statutorily valid, Charter-based provision that constrain the Board, the Lead Investors can set the number of directors without relying on the Stockholders Agreement. The Size Requirement is currently superfluous.

But, as in *Moelis*, that does not mean the Size Requirement is not facially invalid.[90] The Size Requirement can only become operative if the Lead Investors' holdings drop below 40%. At that point Article VI(B)(ii) of the Charter would control, and it requires that "the number of directors which shall constitute the Board of Directors shall be fixed exclusively from time to time by . . . resolution adopted by the affirmative vote of a majority of the directors then in office."[91] The language in the Stockholders Agreement requiring the Board to set the number of directors "subject to the rights of the Lead Investors under [the Size Requirement], or (b) the number of Directors as otherwise requested in writing by the Lead Investors" would conflict with the Charter and be invalid.[92]

---

[89] Compl. ¶ 11; Def.'s Opening Br. at 5–6.

[90] *Moelis*, 311 A.3d at 874.

[91] Charter, art. VI, pt. B

[92] SA § 2.1.1. It is interesting to ponder whether, under the Governance Agreement Provision, the Charter is sufficiently specific to override Section 122(18)

39

There is no setting where the Lead Investors could invoke the Size Requirement and have it operate validly. The only time it can operate is if the Lead Investors' stock ownership falls below 40%, and the directors want to expand or contract the Board to a different size then the Lead Investors prefer. Only in that setting does the Size Requirement kick in, and in that setting, it operates invalidly to constrain the Board's authority under Section 141(a) and the Charter. The Size Requirement is therefore facially invalid.

b. **The Collective Analysis Of The Pre-Approval Requirements**

In addition to challenging the Pre-Approval Requirements individually, the plaintiff also attacks them collectively. An individual provision in a governance agreement that purports to enable stockholders to manage the business and affairs of a corporation, without specific authorization in either the DGCL or the charter, is invalid.[93] A comprehensive suite of provisions that attempts to enable stockholders to manage the business and affairs of a corporation is similarly invalid.

Taken in their totality, the Pre-Approval Requirements put the Board in the same position as officers, who propose options for a board to review and approve. With the Lead Investors holding the Pre-Approval Requirements, the Board must propose options for the Lead Investors to review and approve. "[T]he power to review is the

for purposes of the Size Requirement. The Market Practice Amendments direct the courts to apply the old law in this case, not the new, so this decision offers no opportunity to express a view on that point.

[93] *See* Part II.A.2, *supra.*

power to decide."[94] Here, the Lead Investors have expansive power to pre-review, which gives them the power to decide.

The Company advances various arguments that the court addressed in the *Moelis* and *Wagner* decisions. The Company inaccurately describes the Pre-Approval Requirements as "consent rights"[95] and argues that the "consent rights" do not constrain the Board because they do "not compel the Board to take any particular action" and are "structured in such a way that board members are not restricted from discharging their fiduciary duties."[96] The *Moelis* and *Wagner* decisions considered nearly identical arguments and rejected them.[97]

The Company also argues that the Pre-Approval Requirements do not actually constrain the Board unless exercised, and the Company says they never have been.[98] The *Moelis* decision considered nearly identical arguments and rejected them.[99]

---

[94] Stephen M. Bainbridge, *Director Primacy in Corporate Takeovers: Preliminary Reflections*, 55 Stan. L. Rev. 791, 815 (2002); *see also id.* at 807 n.92.

[95] *See* Def.'s Opening Br. at 28 ("The Approvals [Requirements are] a suite of consent rights over acts and transactions taken by the Company."); *id.* at 29 ("Here, the Board retains its decision-making authority as to the consent rights and is not 'precluded' from exercising its Section 141(a) powers relating to them."); *id.* at 31 ("The Approvals [Requirements] merely provides the Majority Stockholders a limited consent right to reject the Board's candidate and have the Board choose again, a mechanism by which the Board retains the ultimate freedom to direct the strategy and affairs of the Company and continue discharging its fiduciary duties."); Tr. 35 ("It's a consent right.").

[96] Def.'s Opening Br. at 28.

[97] *Moelis*, 311 A.3d at 867–69; *Wagner*, 2024 WL 2741191 at *17.

[98] Def.'s Opening Br. at 28–29, 33, 52; Tr. 30.

[99] *Moelis*, 311 A.3d at 868–69.

The *Abercrombie* decision illustrates why the Pre-Approval Requirements cannot pass muster. There, ten stockholders formed a corporation and entered into a shareholder agreement, granting each the right to designate directors based on their proportionate ownership.[100] Later, six stockholders entered into an agents' agreement, allowing them to designate a majority of the directors.[101] The purpose was to ensure these directors voted as a bloc, with a provision for consensus among the appointed agents or arbitration if consensus could not be reached.[102] The agents' agreement did not literally bind the director designees of the corporate stockholders to vote as seven out of eight agents agreed or an arbitrator determined. Instead, the corporate stockholders bound themselves to:

> use their best efforts to cause their representatives on the Board of Directors . . . to vote . . . as determined by the Agents or by any seven thereof, and that in the event of the failure of any such director so to vote all parties hereto will cooperate and act in any legal manner possible to cause any director voting contrary to any such determination by the Agents to resign or be removed and to be replaced upon the Board of Directors . . . .[103]

Nevertheless, this provision was invalid as to the other directors "[b]ecause it tends to limit in a substantial way the freedom of director decisions on matters of management policy" and therefore prevents each director from being able "to exercise

---

[100] *Abercrombie*, 123 A.2d at 894–95.

[101] *Id.* at 895.

[102] *Id.* at 895–98.

[103] *Id.* at 897.

his own best judgment on matters coming before the board."[104] Chancellor Seitz also noted that a director might feel bound to honor a decision even though it was contrary to his own best judgment.[105]

The same is true here. In fact, the Pre-Approval Requirements are more pernicious than the agreement in *Abercrombie*, because they expressly require the Lead Investors' prior written approval before the Company can act. In *Abercrombie*, the directors other than Davies only faced the threat of removal after the fact.

The Pre-Approval Requirements are sufficiently encompassing to render the Board an advisory body on many of the most significant actions that directors can take. In those instances, the Lead Investors, not the Board, are running the show, and the directors can only act to the extent that the Lead Investors let them. Collectively, the Pre-Approval Requirements have the effect of removing from the directors, in a very substantial way, their duty to use their own best judgment on management matters. Taken as a whole, they are facially invalid under Section 141(a).

## B.      The Facial Challenge To The Board Composition Covenants

The plaintiffs next mount a facial challenge to the Board Composition Covenants. There are six of them: the Board Size Covenant, the Nomination

---

[104] *Id.* at 899.

[105] *Id.*

43

Covenant, the Recommendation Covenant, the Efforts Covenant, the Vacancy Covenant, and the Nomination Veto.

### 1. The Possibility Of Incorporation By Reference

The analysis of the Board Compensation Covenants generally tracks the analysis in *Moelis* and *Wagner*, but with a twist: Certain provisions in the Charter[106] and Bylaws[107] contain language stating that the provision is "subject to" the Lead Investors' rights under the Stockholders Agreement. That raises a threshold question: Can the Charter or Bylaws incorporate the substantive provisions in an external agreement by reference? The structure of the DGCL indicates that incorporating substantive provisions by reference is not possible.[108]

Analysis starts with the language of the DGCL. There is only one recurring phrase in the DGCL that authorizes looking to sources beyond the instrument in question—the ability to make a provision "dependent upon facts ascertainable." For example, after listing optional provisions that can appear in a certificate, Section 102(d) of the DGCL states:

> [A]ny provision of the certificate of incorporation may be made dependent upon facts ascertainable outside such instrument, provided that the manner in which such facts shall operate upon the provision is clearly and explicitly set forth therein. The term "facts," as used in this subsection, includes, but is not limited to, the occurrence of any event,

---

[106] *See* Charter, art. VI, pt. B, E, F.

[107] *See* Bylaws §§ 3.2, 3.3, 3.5, 3.6, 3.14, 3.16.

[108] As noted previously, this issue will not arise for governance agreements after August 1, 2024, because the Governance Agreement Provision eliminates any need for an incorporate-by-reference workaround to Section 141(a).

44

including a determination or action by any person or body, including the corporation.[109]

Section 102(d) thus distinguishes between "facts" external to the charter and "provisions" internal to the charter. Other provisions in the DGCL use the same phrasing.[110] Nowhere does the DGCL contemplate that a charter could include "provisions ascertainable" outside the charter.

Invoking Section 102(d), the Company argues that that section "permits, with very limited exceptions, the terms of a certificate of incorporation to be made dependent upon facts ascertainable outside of its four corners."[111] But there is a self-evident difference between "facts" and "provisions." A "fact" is "[s]omething that actually exists; an aspect of reality" or "[a]n actual or alleged event or circumstance, as distinguished from its legal effect, consequence, or interpretation."[112] A "provision," by contrast, is a "clause in a statute, contract, or other legal instrument."[113]

Under the common meaning of those terms, the concept of facts ascertainable refers to specific inputs. Those words are not a vehicle for introducing additional

---

[109] 8 *Del. C.* § 102(d). Section 102(d) identifies some types of provisions that cannot be made dependent on facts ascertainable outside of the charter, but none of them apply.

[110] *E.g., Id.* §§ 151(a), 152(c), 157(d), 251(b), 252(b), 254(c), 255(b), 256(b), 257(b), 263(b), 264(b), 265(k), 266(l), 388(l), 390(j).

[111] Def.'s Opening Suppl. Br. at 1.

[112] Fact, *Black's Law Dictionary* (12th ed. 2024).

[113] Provision, *Black's Law Dictionary* (12th ed. 2024).

substantive provisions. Section 102(d) and the other provisions in the DGCL that refer to "facts ascertainable" reinforce the distinction. They provide examples of facts, such as "the occurrence of any event" or "a determination or action by any person or body." Those are events. The sections do not speak in terms of provisions from other agreements. Instead, they contemplate that the provisions are in the charter.

The ability to use a certificate of designations to specify the terms of preferred stock reinforces the distinction between facts and provisions. The pertinent sections of the DGCL make clear that when a board possesses blank check authority and exercises it to create a new class or series of stock, the board must do so through a certificate of designations that becomes part of the certificate of incorporation.[114] A board cannot simply declare that the newly issued preferred stock exists and incorporate a set of rights, powers, and preferences by reference to an external document. The certificate of designation must identify the rights, powers, and preferences.

Strong policy reasons support requiring the charter to operate as a self-contained set of provisions. One is public notice. The DGCL mandates that the charter be filed with the Secretary of State as a public document.[115] As Professor Jill Fisch explains,

> The rationale for requiring public filing of the corporate charter is to make certain basic information about the corporation available to both investors and third parties who deal with the corporation. Corporate

---

[114] 8 *Del. C.* §§ 102(a)(4), 141(d), & 151(a) & (g).

[115] *Id.* §§ 101(a) & 103(c)(8).

charters therefore contain information on the corporation's key features including its legal purpose, its control dynamics, and its capital structure. One should be able to determine from the charter both what a corporation has the power to do and who can exercise that power.[116]

Incorporating provisions by reference from another agreement frustrates that important interest. To be sure, the federal securities laws might require that listed companies file their governance agreements publicly, but Delaware corporate law applies equally to publicly traded and privately held firms.[117] In a private corporation, stockholders may not have ready access to the terms of the incorporated agreement, and the publicly filed version of the charter would not be complete.[118] The importance of the publicly filed charter counsels against incorporation by reference.

Another significant policy interest is the certainty and stability of the corporation's foundational firm-specific document. The certificate of incorporation is "the fundamental document which imbues a corporation with its life and powers."[119] It is not only a contract between the corporation and its stockholders; it is also "a contract between the State and the corporation."[120]

---

[116] Jill Fisch, *Stealth Governance: Shareholder Agreements and Private Ordering*, 99 Wash. U. L. Rev. 913, 947 (2021).

[117] *Nixon v. Blackwell*, 626 A.2d 1366, 1380 (Del. 1993).

[118] As discussed below, a stockholder could obtain a copy of the agreement by using Section 220 of the DGCL, but that requires additional steps. *See* 8 *Del. C.* § 220. It is not the same as simply requesting the charter from the Delaware Secretary of State.

[119] *STARR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1137 (Del. 1991) (citations omitted) (subsequent history omitted).

[120] *Id.*

Section 242 of the DGCL establishes a step-by-step process to be followed for charter amendments that starts with a board recommendation and then continues with a stockholder vote. It states:

> If the corporation has capital stock, its board of directors shall adopt a resolution setting forth the amendment proposed, declaring its advisability, and either calling a special meeting of the stockholders entitled to vote in respect thereof for the consideration of such amendment or directing that the amendment proposed be considered at the next annual meeting of the stockholders.[121]

Charter amendments depend for their legitimacy on that process being followed, and the Delaware Supreme Court has held that because of the "fundamental interests" in play when a charter is amended, those processes must be "scrupulously observe[d]."[122]

Notably, Section 242 contemplates a stockholder vote on charter amendments, and if the amendment would adversely affect a series of class of shares, then the holders of those shares get a class or series vote.[123] Under Section 242, stockholders thus get to participate and have a voice in the amendment process, with enhanced voice when an amendment adversely affects their class or series.

 Once a charter incorporates a contract by reference, the parties to that contract can skip the Section 242 process and amend the charter simply by amending

---

[121] 8 *Del. C.* § 242(b)(1).

[122] *STAAR Surgical*, 588 A.2d at 1136; *see also Blades v. Wisehart*, 2010 WL 4638603, at *8 (Del. Ch. Nov. 17, 2010) (explaining that Section 242's procedural requirements "must be followed precisely, and may not be altered by charter provision.") (subsequent history omitted).

[123] 8 *Del. C.* § 242(b).

48

the agreement. The state would not be involved, and in a private company, no one need know. Stockholders would not have a voice.

This case demonstrates that danger, because the Stockholders Agreement has already been amended once in a manner that altered the Nomination Covenant, the Nomination Veto, and the Pre-Approval Requirements.[124] The Company and the Lead Investors can amend it again in the future.[125] The importance of the Section 242 amendment process counsels against incorporation by reference.

Yet another consideration is the extent to which the General Assembly could enact a statute that incorporates a private agreement by reference. During the era of special charters, forming a corporation required that the General Assembly pass a special act.[126] The shift to general incorporation standardized the manner in which charters would be issued, delegated that function to the Delaware Secretary of State, and moved the state's role into the background, but the issuance of a charter and the creation of a body corporate remains a sovereign exercise of state power akin to enacting a statute.[127]

A significant body of law establishes that the General Assembly cannot delegate its legislative powers. For example, "[i]t is axiomatic that the General

---

[124] Amend. §§ 1–4.

[125] *See* SA § 6.2.

[126] Samuel Arsht, *A History of Delaware Corporate Law*, 1 Del. J. Corp. L. 1, 2–6 (1976) (discussing special act incorporation).

[127] *See id.* at 6–7.

Assembly may not delegate to any other agency authority to exercise [legislative] powers."[128]

> The maxim that power conferred upon the legislature to make laws cannot be delegated to any other authority does not preclude the legislature from delegating any power not legislative which it may itself rightfully exercise . . . . The legislature must declare the policy of the law and fix the legal principles which are to control in given cases; but an administrative officer or body may be invested with the power to ascertain the facts and conditions to which the policy and principles apply.[129]

If the General Assembly enacted a statute that incorporated a contract by reference, the General Assembly would have impermissibly delegated to the contracting parties the power to change the statute. The private parties would be able to "declare policy" or "fix the legal principles which are to control in given cases." That would not be permissible.

The Company responds that the Delaware Limited Liability Company Act ("LLC Act") demonstrates that the General Assembly can enact a law that incorporates the terms of a contract—in that case, the LLC agreement. Other alternative entity statutes operate in the same way. But the relationship between the LLC Act and an LLC agreement resembles the relationship between the DGCL and the corporation's charter and bylaws. In both cases, the statute authorizes the existence of an entity-specific document. The entity-specific document does not become part of the statute.

---

[128] *Opinion of the Justices*, 177 A.2d 205, 209 (Del. 1962).

[129] *Id.* (quoting *State v. Tatnall*, 21 A.2d 185, 190–91 (Del. 1941)).

50

The Company also points to the legislation establishing the Delaware Prosperity Partnership, a nonprofit state economic development agency.[130] That statute identifies requirements that the agency's conflict of interest policy must contain, but otherwise leaves the details of the policy to the agency to adopt.[131] Here again, the policy does not become part of the statute.

Admittedly, the fact versus provision distinction can involve close questions. In the recent *AIM* decision, for example, the corporation's bylaws cited and relied on a definition of "affiliate" and "associate" from the federal securities laws.[132] No one challenged the use of that definition as invalidly incorporating by reference an external and mutable standard. Technically, that is what the bylaws did, but the definition did not appear in a private contract; it appeared in a government regulation. The parties to a private contract therefore would not be in a position to revise the definition at will. Incorporating an external statute or regulation parallels the incorporation by reference of the DGCL into every corporate charter.[133]

---

[130] *See* 29 *Del. C.* § 8706A.

[131] *Id.* § 8706A(h)(2).

[132] *Kellner v. AIM ImmunoTech, Inc.*, 307 A.3d 998, 1029 n.294 (Del. Ch. 2023), *aff'd in part, rev'd in part*, --- A.3d ---, --, 2024 WL 3370273 (Del. July 11, 2024).

[133] 8 *Del. C.* § 394 ("This chapter and all amendments thereof shall be a part of the charter or certificate of incorporation of every corporation except so far as the same are inapplicable and inappropriate to the objects of the corporation.").

To argue for the opposite result, the Company cites the *Bumble* and *Bicoastal* decisions.[134] In *Bumble*, the charter provided that if a share was held by a "Principal Stockholder," then it would carry ten votes.[135] The Principal Stockholders comprised the parties to an external contract. The identity of the parties to the external contract was an ascertainable fact.[136] The reference to that input did not incorporate by reference the substantive provisions of the external contract. The *Bumble* charter also addressed clearly and explicitly "the manner in which such facts shall operate upon the provision."[137] Here, the Charter simply states that three of its terms are "subject to" the Stockholders Agreement. That is not a fact ascertainable. The *Bumble* decision therefore does not help the Company.

The Company finds a stronger precedent in the *Bicoastal* case. There, the Delaware Supreme Court upheld language in a certificate of designations which provided that the company would not redeem any shares of a series of preferred stock if "such redemption would violate any covenant of the Corporation in any contract,

---

[134] The Company also cites *Kellner* and *Klassen v. Allegro Development Corp.*, 2013 WL 5739680 (Del. Ch. Oct. 11, 2013). Neither party challenged incorporation by reference in those cases.

[135] *Colon v. Bumble, Inc*, 305 A.3d 352, 363 (Del. Ch. 2023) ("[T]he charter sets out a formula that applies to all the shares in the class and that specifies how voting power is calculated. As authorized by Section 151(a), the formula makes the quantum of voting power that a share carries dependent on a fact ascertainable outside of the certificate of incorporation, namely the identity of the owner.").

[136] *Id.* at 357.

[137] *Id.* at 372.

agreement, obligation, or guarantee of the Corporation . . . ."[138] At first blush, that might sound like a provision that incorporates by reference "any contract, agreement, obligation or guarantee of the Corporation." But what the provision actually turned on was a binary factual input: breach or no breach. The charter did not attempt to incorporate the universe of contracts, agreements, or guarantees to which the corporation was a party into the language of the charter.

For these reasons, the Charter cannot incorporate the Stockholders Agreement by reference through the simple device of mentioning in three provisions that they are "subject to" the Stockholders Agreement.[139] The DGCL does not permit the wholesale inclusion of provisions from private agreements into charters through incorporation by reference. Because the operative provisions of a certificate of incorporation must appear in the certificate, the references to the Stockholders Agreement are nullities.

### 2. The Recommendation Covenant

The Recommendation Covenant mandates that the Company recommend the election of the Lead Investor's designees, whoever they might be, by requiring that the Company include these designees "on each slate of nominees for election of the Board . . . [and] to recommend the election of such nominees to the stockholders of

---

[138] *In re Bicoastal Corp.*, 600 A.2d 343, 346 n.4 (Del. 1991) (emphasis omitted).

[139] Charter, art. VI, pt. B, E, F.

the Company . . . ."[140] That obligation is facially invalid for the reasons stated in *Moelis*.[141]

### 3. The Vacancy Covenant

The Vacancy Covenant mandates that the Board fill any vacancy in a seat occupied by the designee of a Lead Investor with another Lead Investor designee. That obligation is facially invalid.

Section 223(a) of the DGCL addresses the filling of vacancies. It states:

(a) Unless otherwise provided in the certificate of incorporation or bylaws:

> (1) Vacancies and newly created directorships resulting from any increase in the authorized number of directors elected by all of the stockholders having the right to vote as a single class may be filled by a majority of the directors then in office, although less than a quorum, or by a sole remaining director;

> (2) Whenever the holders of any class or classes of stock or series thereof are entitled to elect 1 or more directors by the certificate of incorporation, vacancies and newly created directorships of such class or classes or series may be filled by a majority of the directors elected by such class or classes or series thereof then in office, or by a sole remaining director so elected.

If at any time, by reason of death or resignation or other cause, a corporation should have no directors in office, then any officer or any stockholder or an executor, administrator, trustee or guardian of a stockholder, or other fiduciary entrusted with like responsibility for the person or estate of a stockholder, may call a special meeting of stockholders in accordance with the certificate of incorporation or the

---

[140] SA § 2.1.2(c).

[141] *Moelis*, 311 A.3d at 827, 870–72.

54

bylaws, or may apply to the Court of Chancery for a decree summarily ordering an election as provided in § 211 or § 215 of this title.[142]

Article VI, Part E of the Charter gives the Board the power to fill vacancies. It states:

> Subject to the rights of the holders of any series of Preferred Stock then outstanding or the rights granted pursuant to the Stockholders Agreement . . . (ii) any vacancies in the Board of Directors resulting from death, resignation, disqualification, removal from office or any other cause may be filled only by the Board of Directors (and not by stockholders) . . . .[143]

The Bylaws say the same thing:

> Except as otherwise provided by applicable law, vacancies occurring in any directorship (whether by death, resignation, retirement, disqualification, removal or other cause) and newly created directorships resulting from any increase in the number of directors shall be filled in accordance with the Certificate of Incorporation and the Stockholders Agreement.[144]

The DGCL, the Charter, and the Bylaws thus provide that only the Board can fill vacancies. "The power to fill a vacancy includes the power to select the person to fill it."[145]

The Stockholders Agreement attempts to establish a different mechanism. Under the Vacancy Covenant, the Board cannot use its own judgment for a vacancy if the seat was formerly occupied by a Lead Investor designee. The Board must

---

[142] 8 *Del. C.* § 223(a).

[143] Charter, art. VI, pt. E.

[144] Bylaws § 3.6.

[145] *Moelis*, 311 A.3d at 873.

appoint another Lead Investor designee. The *Moelis* decision held that a similar provision was invalid.[146] That same analysis applies here.

The *Chapin* case is also on point. There, this court held that directors of a non-stock corporation (who were called trustees) could not bind themselves via a succession agreement to name designated persons to fill vacancies on the board of trustees before the vacancy actually arose.[147] The court explained that the trustees needed to be free to use "their best judgment in filling a vacancy on the board of trustees as of the time the need arises."[148] Under *Chapin*, the Vacancy Covenant violates Section 141(a). The only difference between the succession agreement in *Chapin* and the Vacancy Covenant is that the trustees agreed on specific people to fill vacancies as they arose. Under the Vacancy Covenant, the Company must fill the vacancy with a person whom the Lead Investors designate. The limitation on the Board's power is the same. The Vacancy Covenant is invalid under Sections 141(a) and 223.

### 4. The Nomination Covenant

The Nomination Covenant obligates the Company "to include the nominees of the Lead Investors . . . as the nominees to the Board on each slate of nominees for election of the Board included in the Company's annual meeting proxy statement (or

---

[146] *Id.* at 872–73.

[147] *Chapin*, 402 A.2d at 1210.

[148] *Id.* at 1211.

consent solicitation or similar document) . . . ."[149] For the reasons stated in the *Moelis* decision, that provision is not facially invalid.[150]

### 5.       The Efforts Covenant

The Efforts Covenant obligates the Company to "otherwise use its reasonable best efforts to cause [the Lead Investors'] nominees to be elected to the Board, including providing at least as high a level of support for the election of such nominees as it provides to any other individual standing for election as a director."[151] The Efforts Covenant as a whole is not facially invalid, only the requirement that the Company provide "at least as high a level of support for the election of such nominees as it provides to any other individual standing for election as a director."

As explained in *Moelis*, the first part of the Efforts Covenant legitimately obligates the Company to take ministerial steps to ensure that stockholders can consider the Lead Investors' nominees and potentially elect them, such as by adding the Lead Investors' designees to the Company's proxy card or by including information about them in the Company's proxy.[152] Even in a situation where the Board opposed the election of a Lead Investor designee, those actions would not constitute a meaningful infringement on the Board's authority under Section

---

[149] SA § 2.1.2(c).

[150] *Moelis*, 311 A.3d at 875.

[151] SA § 2.1.2(c).

[152] *Moelis*, 311 A.3d at 875.

141(a).[153] There might be situations in which an as-applied challenge to the Efforts Covenant could succeed, but the existence of scenarios in which the Efforts Covenant could operate legitimately is sufficient to defeat a facial challenge.

The outcome is different for the requirement that the Company provide "at least as high a level of support for the election of such nominees as it provides to any other individual standing for election as a director." The resulting obligation operates like the Recommendation Covenant by forcing the Board to support a Lead Investor candidate that the Board does not support to the same degree as candidates that the Board does support. The Board gest to decide how much support to give a particular candidate. This provision is therefore invalid.

## C.     The Facial Challenge To The Committee Composition Provisions

Next, the plaintiffs mount a facial challenge to the Committees Provisions. Those provisions are invalid under Section 141(a) and Section 141(c)(2).

Section 141(c)(2) empowers the board to determine the composition of committees. It states:

> The board of directors may designate 1 or more committees, each committee to consist of 1 or more of the directors of the corporation. The board may designate 1 or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.[154]

---

[153] *Id.*

[154] 8 *Del. C.* § 141(c)(2).

58

"In plain terms, that section empowers the board to create committees and select the members who will serve on those committees."[155]

The Charter does not provide for any deviation from this default when designating committees or committee members. Without giving effect to the Company's attempt to incorporate the Stockholders Agreement by reference,[156] the Bylaws confirm that Section 141(c)(2) applies to the Company. Section 3.14 of the Bylaws states:

> The Board may designate one or more committees, each committee to consist of one or more of the directors of the Corporation in accordance with the Stockholder Agreement . . . The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members of the committee present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member.[157]

That provision envisions the Board establishing committees and designating its members. This contrasts with the Committee Composition Provisions, which require that "for so long as the Company maintains the Audit Committee, it shall consist of at least one Silver Lake Director . . . and at least one Thoma Bravo Director . . ."[158]

---

[155] *Moelis,* 311 A.3d at 876.

[156] *See* Part II.B.1, *supra.*

[157] Bylaws § 3.14

[158] SA § 2.1.4(a).

This requirement is repeated for the Compensation Committee, Nominating Committee, and any other committee of the Board not specified in the Stockholders Agreement.[159]

In response, the Company states that "[n]othing in the Committees Provision, however, 'commit[s] the board of directors to a course of action that would preclude them from fully discharging their fiduciary duties to the corporation and its shareholders.' Rather, it provides the Majority Stockholders with the contractual right to representation on the committees that the Board chooses to designate."[160] That is doubletalk. The Board cannot independently select committee members in the face of the Committee Composition Provisions.

To support the Committee Composition Provisions, the Company cites a number of cases in which settlements resulted in committees which were required to have either independent or expert members.[161] Those were court-approved settlements, not a private governance agreement.

The Committee Composition Provisions guarantee that favored stockholders will have seats on each of the Board's committees. They force the Board to select the committee members designated by the Lead Investors.

---

[159] *Id.* § 2.1.4(b)–(c).

[160] Def.'s Opening Br. at 46 (quoting *AFSCME*, 953 A.2d at 238).

[161] *Id.* at 47–48.

The Committee Composition Provision found in Section 2.1.4(c) identifies two instances in which the Lead Investors will not have guaranteed seats on a special committee. First, if no Lead Investor designee is eligible to serve on the special committee due to the requirements of a stock exchange.[162] Second, if

> the primary purpose of such special committee is to review, assess and/or approve a transaction in which the applicable Lead Investor has a material direct or indirect interest and having such Lead Investor's Director appointed on such special committee would constitute a clear conflict of interest, in each case as determined by a majority of the Independent Directors in their reasonable good faith discretion.[163]

These exceptions are helpful, but they do not address the Audit, Compensation, or Nominating Committees. The Board is still bound when selecting those committee members.

Next, the Company asserts that "nothing in Section 141(c) suggests the Board's decision-making needs to be exclusive."[164] As discussed in the *Moelis* decision, that argument is not persuasive.[165]

The Committee Composition Provisions contravene both Section 141(a) and Section 141(c)(2) by requiring that the Board include one of each Lead Investors' designees on every committee. Those provisions are facially invalid as well.

---

[162] SA § 2.1.4(c).

[163] *Id.*

[164] Def.'s Opening Br. at 49.

[165] *Moelis*, 311 A.3d at 876–77.

## D. The Facial Challenge To The Removal Provision

The plaintiffs last contend that the plain language of the Removal Provision violates Section 141(k) by permitting the Lead Investors to remove directors with less than a majority vote so long as they hold at least 30% of the Company's voting shares. The plaintiffs are correct.

> Section 141(k) states:
>
> Any director or the entire board of directors may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors, except as follows: (1) Unless the certificate of incorporation otherwise provides, in the case of a corporation whose board is classified as provided in subsection (d) of this section, stockholders may effect such removal only for cause . . . .[166]

By contrast, the Removal Provision states:

> (i) prior to the first date on which the Investors and their Affiliates cease to beneficially own (directly or indirectly) in the aggregate at least 30% of the voting power of the then outstanding shares of capital stock of the Corporation then entitled to vote generally in the election of directors, directors may be removed with or without cause upon the affirmative vote of the Investors and their respective Affiliates which beneficially own shares of capital stock of the Corporation entitled to vote generally in the election of directors and
>
> (ii) on and after such date, directors may only be removed for cause (as defined below) and only upon the affirmative vote of stockholders representing at least sixty-six and two-thirds percent (66-2/3%) of the voting power of all of the then outstanding shares of the capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class. . . .[167]

That provision conflicts with Section 141(k) and is therefore facially invalid.

---

[166] 8 *Del. C.* § 141(k).

[167] Charter, art.VI, pt. F (formatting added).

The Removal Provision attempts to depart from Section 141(k) in two ways. First, the Removal Provision authorizes a director on a classified board to be removed without cause. Second, the Removal Provision authorizes the Lead Investors to remove a director without cause, even if the Lead Investors are not "holders of a majority of the shares then entitled to vote at an election of directors."[168]

The parties agree that nothing in the DGCL authorizes the removal of a director by less than a majority vote of the stockholders. Section 102(b)(4) authorizes charter provisions to require a larger vote than a simple majority.[169] Section 102(b)(4) does not authorize a minority vote for removal.

As its first gambit, the Company seeks to defend the Removal Provision by rewriting its language. According to the Company, the provision only allows the Lead Investors to call for a majority vote to remove a director from the Company's classified board without cause.[170] But that is not what the Removal Provision says. It states that "directors may be removed with or without cause upon the affirmative vote of

---

[168] 8 *Del. C.* § 141(k).

[169] *Id.* § 102(b)(4).

[170] Tr. 51 ("[W]e are not taking the position that [the Removal Provision] lowers the required vote for removal."); Def.'s Opening Br. at 51 ("Under the Removals Provision, in circumstances where the Majority Stockholders own at least 30% of the outstanding stock, the affirmative vote of the Majority Stockholders would allow for the removal of a director to be effected *without cause*. If the Majority Stockholders own at least 30% of the outstanding stock and they do not provide such a vote, the holders of a majority in voting power of the outstanding stock entitled to vote in an election of directors would have the power to remove directors, but any such removal would also require a showing of cause.").

the Investors and their respective Affiliates . . . ."[171] That means however many shares they own, as long as it is more than 30%.

The Company next argues that the Removal Provision survives a facial challenge because the Lead Investors are majority stockholders and can thus remove directors, with or without cause, without invoking the challenged provision.[172] But if the Lead Investors act to remove a director as holders of a majority of the voting power, they are not relying on the Removal Provision; they are simply doing what Section 141(k) permits. The Removal Provision only has utility once the Lead Investors' holdings fall below 50%. Thus, in every setting where the Removal Provision operates, it violates Section 141(k).

Finally, the Company relies on Section 102(b)(1), which states:

(b) In addition to the matters required to be set forth in the certificate of incorporation by subsection (a) of this section, the certificate of incorporation may also contain any or all of the following matters:

(1) Any provision for the management of the business and for the conduct of the affairs of the corporation, and any provision creating, defining, limiting and regulating the powers of the corporation, the directors, and the stockholders, or any class of the stockholders, or the governing body, members, or any class or group of members of a nonstock corporation; if such provisions are not contrary to the laws of this State. Any provision which is required or permitted by any section of this chapter to be stated in the bylaws may instead be stated in the certificate of incorporation[.][173]

---

[171] Charter, art.VI, pt. F.

[172] Def.'s Opening Br. at 52.

[173] 8 *Del. C.* § 102(b)(1).

That section does not permit a charter to contain provisions which are "contrary to the laws of this State."[174] Here, the Removal Provision is contrary to Section 141(k), and invalid.

## E.    The Policy Arguments

The Company advances a series of policy arguments in favor of the Stockholders Agreement. This court analyzed those arguments in *Moelis*.[175] This decision need not repeat that discussion.

The Company raises one new argument. According to the Company, concerns regarding the effect of private agreements upon corporate governance should be minimized by the fact that agreements like the Stockholders Agreement will be publicly filed as a material agreement or available through a Section 220 demand. The argument about public filing applies only to public companies; private companies are not required to disclose governance agreements. In all events, publicizing a statutory violation does not cure a statutory violation.

The Company is correct that a stockholder could seek a copy using Section 220 of the DGCL, but first the stockholder would have to suspect that a governance agreement existed. Then, the stockholder would have to make a demand and, if necessary, enforce it. And because of the contract parties' ability to amend the agreement, a stockholder would have to send serial Section 220 demands on a regular

---

[174] *Id.*

[175] *See Moelis*, 311 A.3d at 877–81.

65

basis to understand the current governance regime. The protection seemingly offered by a stockholder's ability to request books and records is illusory.

## F.    The Statutory Elephant

The elephant in the room for this decision is Senate Bill 313. That statute enacted the Market Practice Amendments with the avowed purpose of reaching different outcomes than the *Moelis* decision and conforming the requirements of the DGCL to match currently prevailing market practice. One of the Market Practice Amendments is the Governance Agreement Provision, which authorizes governance agreements like the Stockholders Agreement in this case.[176] The bill enacting the Market Practice Amendments has this to say about when they become effective and what they apply to:

> Sections 1 through 5 of this Act shall become effective on August 1, 2024, and shall apply to all contracts made by a corporation, all agreements, instruments or documents approved by the board of directors and all agreements of merger and consolidation entered into by a corporation, in each case whether or not the contracts, agreements, instruments, documents or agreements of merger or consolidation are made, approved or entered into on or before such date, except that these Sections 1 through 6 of this Act shall not apply to or affect any civil action or proceeding completed or pending on or before such date.[177]

The Market Practice Amendments thus apply both prospectively and retrospectively, but with a donut hole for "any civil action or proceeding completed or pending on or before [August 1, 2024]."

---

[176] 84 Del. Laws Ch. 309 (2024).

[177] *Id.* § 6.

66

This case falls into the donut hole, as do *Moelis*, *Wagner*, and a handful of other pending actions. That means that this court and the Delaware Supreme Court must expend judicial resources dealing with those cases by applying old law that has now been changed.

There is no legal reason why the statute had to create the donut hole and force the courts to deal with these cases under a now superseded version of the DGCL "Retrospective operation is not favored by courts, and a law is not construed as retroactive unless the act clearly, by express language or necessary implication, indicates that the legislature intended a retroactive application."[178] A Delaware court thus will presume that a new statute only applies prospectively. But when the General Assembly makes clear that an act will have retroactive effect, the Delaware courts will follow suit.[179] Setting aside the donut hole, the Governance Agreement Provision explicitly has retroactive effect. It applies to "all contracts made by a corporation … whether or not the contracts … are made, approved or entered into on or before such date [i.e, August 1, 2024]."

There are two provisions in the DGCL that nominally prohibit retroactive application. Section 393 states:

> All rights, privileges and immunities vested or accrued by and under any laws enacted prior to the adoption or amendment of this chapter, all suits pending, all rights of action conferred, and all duties, restrictions,

---

[178] *Fountain v. State*, 139 A.3d 837, 842 (Del. 2016 (quoting 2 Norman J. Singer, *Sutherland Statutes and Statutory Construction* § 41:4 (7th ed. 2015)).

[179] *See generally A.W. Fin. Servs., S.A. v. Empire Res., Inc.*, 981 A.2d 1114, 1120 (Del. 2009).

liabilities and penalties imposed or required by and under laws enacted prior to the adoption or amendment of this chapter, shall not be impaired, diminished or affected by this chapter.[180]

That language would seem to provide that statutory amendments must be prospective and, among other things, cannot affect any rights "vested or accrued by and under any laws enacted prior to the adoption or amendment of this chapter."

The same is true for Section 394, which provides that:

This chapter may be amended or repealed, at the pleasure of the General Assembly, but any amendment or repeal shall not take away or impair any remedy under this chapter against any corporation or its officers for any liability which shall have been previously incurred.[181]

That provision also would seem to prevent an amendment that would "take away or impair any remedy under this chapter against any corporation or its officers for any liability which shall have been previously incurred."

So how can the Market Practice Amendments have retroactive effect? The answer lies the hornbook principle that "[i]mplicit in the plenary power of each legislature is the principle that one legislature cannot enact a statute that prevents a future legislature from exercising its lawmaking power."[182] The General Assembly is thus free to override Sections 393 and 394 by expressly enacting a retroactive statute.

---

[180] 8 *Del. C.* § 393.

[181] 8 *Del. C.* § 394.

[182] 82 C.J.S. *Statutes* § 11, Westlaw (database updated May 2024).

Once the General Assembly has made that decision, there is no meaningful difference between (i) pending lawsuits and (ii) injuries that occurred under the prior regime but where no suit has as yet been filed. Section 393 refers not only to "all suits pending," but also all "privileges and immunities vested or accrued by and under any laws enacted prior to the adoption or amendment of this chapter, . . . all rights of action conferred, and all duties, restrictions, liabilities and penalties . . . ." Each of the latter concepts encompasses an injury where, as yet, no lawsuit has been filed. A right of action generally accrues when the injury occurs, not when a party sues.[183]

Consequently, when the General Assembly opts to make a statute retroactive, it alters "privileges and immunities vested or accrued by and under any laws enacted prior to the adoption or amendment of this chapter, … all rights of action conferred, and all duties, restrictions, liabilities and penalties." There is no reason why the statute should not also apply retroactively to "all suits pending," because under Sections 393 and 394, those pending suits have no greater dignity than other vested or accrued rights.

There are few Delaware decisions addressing the retroactive application of a statute to a pending action. The Delaware Family Court considered the issue in 1995 and concluded that in other jurisdictions that have addressed the issue, "[t]he

---

[183] *Weinfeld v. Sullivan*, 2006 WL 2588152, at *1 (Del. Super. Sept. 8, 2006) ("An action 'accrues' when there is a right to sue, and, generally, the time of the injury or wrongful act is the measuring date."); *see Moelis Preliminary Defenses,* 310 A.3d at 994–98 (discussing accrual methods).

tendency in those jurisdictions is to apply the new statute retroactively to those cases pending at the time of enactment."[184]

It seems likely that the proponents of the Market Practice Amendments did not want to appear to be affecting pending lawsuits and therefore created the donut hole. Speaking for myself, I would have preferred the Market Practice Amendments without the donut hole. Once a decision has been made to change the law retroactively, there is no reason to force the courts to apply the superseded law to a smattering of cases. That is a waste of judicial resources. It also risks creating confusion because there will be more extant decisions addressing issues where the Market Practice Amendments could lead to a different result. If the Governance Agreement Provision applied to this case, the court could have given the plaintiffs leave to amend the complaint to raise any challenges they thought could be asserted under the new statute. The case could have been litigated under the law as it will exist as of August 1, 2024. We might have found out something about what the Governance Agreement Provision means, rather than what now superseded law might have meant.

---

[184] *Rafael S. v. Lore S.-S.*, 1995 WL 765515, at \*5 (Del. Fam. Sept. 22, 1995) (collecting authorities); *cf. Ocean Bay Mart, Inc. v. City of Rehoboth Beach Delaware*, 285 A.3d 125, 141 (Del. 2022) (applying new ordinance to pending site plan applications). Resolving the question of whether a statute applies retrospectively in the absence of specific language saying so often preempts the question abut applying a retroactive statute to pending cases. *E.g.*, *Div. of Fam. Servs. v. Palacio*, 2016 WL 1364350, at \*2 (Del. Fam. Feb. 16, 2016).

This is a different issue than an argument that the Council of the Corporation Law Section of the Delaware State Bar Association should not have acted until after the Delaware Supreme Court heard an appeal in *Moelis.* That argument addresses *when* the Council should act (if at all). The donut hole concerns what should happen *after* the Council has decided to act by proposing a statutory amendment with both prospective and retroactive effect. At that point, should the Market Practice Amendments contain the donut hole? They didn't have to, and I wish they hadn't.

The donut hole is like a science fiction plot device where a timeline splits in two. After August 1, 2024, we will live in a world where the Market Practice Amendments have become law. Along that timeline, courts will apply the Governance Agreement Provision to any new challenges to governance agreements. Yet because of the donut hole, there is a stub timeline where courts must apply the old law. Split timelines make for good movies, but not for good law. If the Council finds itself in a similar situation involving an amendment with both retroactive and prospective effect, consider this a polite request to skip the donut hole.

## III.    CONCLUSION

The plaintiffs' motion for summary judgment is granted in part. The Pre-Approval Requirements, the Board Size Covenant, the Recommendation Covenant, the Vacancy Covenant, the Nomination Veto, the Committee Composition Provisions, and the Removal Provision are facially invalid. The Company's motion for summary judgment is granted as to the facial validity of the Nomination Covenant and the Efforts Covenant. The motions are otherwise denied.

Within ten days, the parties will submit a joint letter that attaches an agreed-upon form of order implementing the rulings made in this decision. If the parties cannot agree, they will submit a joint letter outlining their disagreements and proposing a path for resolving them.